UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NOS. 07-60750-CIV-COHN
04-60130-CR-COHN

MARVIN EWART,

        Movant,

VS.

UNITED STATES OF AMERICA,

        Respondent.

_____/

REPORT AND RECOMMENDATION TO DISTRICT JUDGE

I.     INTRODUCTION

THIS CAUSE is before the Court upon the Motion to Vacate, Correct, or Set Aside the Petitioner's Sentence Pursuant to 28 U.S.C. § 2255 (DE 171 – criminal; DE 1 – civil)[1] filed by Marvin Ewart ("Movant"), and was referred to the undersigned pursuant to 28 U.S.C. § 636.  For the following reasons, the undersigned recommends that the Motion be DENIED.

II.    PROCEDURAL HISTORY

On July 27, 2004, a federal grand jury returned a Superseding Indictment charging Movant (and Co-Defendant Hamilton Forrester) with conspiracy to possess with intent to distribute five kilograms or more of cocaine and with using and carrying a firearm during

_____

[1] Some documents cited herein have been docketed in the underlying criminal action (04-60130-Cr-Cohn) only, some documents have been docketed in the instant civil action (07-60750-Civ-Cohn) only, and some documents have been docketed in both. Except where expressly noted (as criminal docket entries), all docket citations refer to the civil file.

and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A) and 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 846.  (DE 54 – criminal).  On September 22, 2004, a jury found Movant guilty of both counts with which he was charged (DE 124 – criminal).[2]

On December 10, 2004, the Court conducted a sentencing hearing.  The Court imposed a sentence of 151 months as to Count I (the narcotics charge), which sentence was at the upper end of the applicable Guideline range.  In addition, the Court imposed a (mandatory) consecutive sentence of 84 months as to Count II (the weapons charge), resulting in a total period of incarceration of 235 months.  (DE 133 – criminal).  On December 13, 2004, the Court entered judgment (DE 135 – criminal).

On December 14, 2004, Movant appealed (DE 136 – criminal). On January 31, 2006, the Eleventh Circuit affirmed the conviction and sentence in an unpublished decision (DE 165 – criminal).  See United States v. Ewart, 164 Fed. Appx. 925 (11th Cir. 2006) (unpublished).  And on March 27, 2006, the Eleventh Circuit issued its mandate (DE 165 – criminal).  Thereafter, Movant did not seek certiorari review with the United States Supreme Court.

On April 20, 2007, Movant timely filed the instant § 2255 motion (DE 171– criminal; DE 1 – civil),[3] as well as an accompanying memorandum (DE 2 – civil).  On October 4, 2007, the Government responded to the Motion (DE 13 – civil).  Movant, however, has

---

[2] The same jury, however, acquitted Co-Defendant Forrester.

[3] Although the Motion was timely filed and entered on the criminal court docket as entry 171 on April 20, 2007, it was not entered onto the civil docket as entry 1 until May 30, 2007, which filing date would have been untimely under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA").  The Government, however, concedes that the Motion was timely filed in the criminal case.  See Response at 2 (DE 13-1 – civil).

neither replied nor requested an enlargement of time within which to do so, and his opportunity to do either has passed.[4]

The matter is now ripe for decision.

III.    FACTS

A.    Trial Testimony

The charges in this case arose out of a joint Alcohol, Tobacco, and Firearms and Broward Sheriff's Office reverse sting operation involving an armed home invasion to steal multiple kilograms of cocaine from a purported stash house.   The Eleventh Circuit summarized the trial testimony in affirming the conviction and sentence on the direct appeal:

> The government presented the following evidence.  Deputy Oswaldo Tianga, of the Broward County Sheriff's Department ("BCSD"), testified about a sting operation involving an attempted armed home-invasion robbery of multiple kilograms of cocaine from a purported "stash house."  Deputy Tianga, who was acting undercover, posed as a disgruntled narcotics courier seeking to recruit people to rob a narcotics organization.  He told the people he recruited that his father had been the head of the narcotics organization and was deported after which he received no assistance from the organization.  As a result, Tianga indicated, he wanted to retaliate against the organization.
>
> On April 27, 2004, Deputy Tianga met with a confidential informant ("CI") and a man named Albert Moore.  At the meeting, Tianga told Moore that he wanted Moore to plan and commit the home invasion robbery of a house that contained at least 15 kilograms of cocaine.  Moore agreed to commit the robbery and said that he had two partners.  Moore said that one person would go in the home and force everyone to the

_____

[4] Movant's reply was due on October 15, 2007.  See S.D. Fla. L.R. 7.1.C.1 (setting forth time limit for filing reply, as well as manner of calculation).

floor, the second person would tie everyone up with duct tape, and the third person would steal the cocaine.

On May 6, 2004, Tianga met with Moore and Leo Ladaras Strachan to discuss more details of the planned home invasion robbery. At this meeting, Deputy Tianga told Moore and Strachan that he would call them when he knew that the shipment of cocaine had arrived and would be at the target house. On May 19, Deputy Tianga met with Strachan alone and Strachan told him that Moore was unreliable and that he (Strachan) could recruit other people to commit the robbery with him, including someone who was "like [his] brother." About a week later, Deputy Tianga called Strachan and told him that the shipment of cocaine had come in.

On the next day, May 27th, Tianga met Strachan and Ewart, who arrived in a silver Honda Accord and who Strachan introduced as his brother. During the meeting, which took place at Lester's Diner, Forrester remained in the Accord. Thereafter, Strachan, Ewart, and Forrester followed Tianga to a nearby warehouse, where Tianga said he was going to receive a phone call indicating where the cocaine was located.

While at the warehouse, Tianga asked the men if they were armed. In response, Ewart displayed a "baby glock," and Strachan displayed a semiautomatic handgun. Forrester also stated that they all had guns. Tianga told the three men that there was going to be 30 kilograms of cocaine and that he was supposed to be transporting seven kilograms of it. He told them that they would have to "lay down" the two guards, and Ewart responded "we going to duct tape their butts." Ewart also said that they would have to tie up Tianga and leave him with the guards. Forrester commented to Tianga that "when you're coming out the house we are going to jam you and bring you back in," and stated that they would leave Tianga's portion of the cocaine in the bathroom at the warehouse.

At this point, Deputy Tianga provided the "takedown signal" for the arrest team and the S.W.A.T. team entered the warehouse. Members of the S.W.A.T. team subsequently shot and killed Strachan when he reached for his weapon. Ewart and Forrester were arrested and placed in the back of a patrol car equipped with a recording device. Ewart told Forrester that he would not be charged with anything, but indicated "They can charge me for conspiracy man, you know."

Raymond Mountz, a forensic detective for the City of Fort Lauderdale, testified that he responded to the warehouse after the shooting.  At the scene he recovered a semi-automatic handgun loaded with seven cartridges and a nine-millimeter Glock firearm loaded with nine cartridges.  He also recovered a role of duct tape from under the front seat of the Honda Accord parked outside the warehouse.

Steven Galloway, a special agent with the ATF, testified that he went to the federal courthouse to help move the two prisoners.  Ewart and Forrester were placed in two separate rooms.  Special Agent Galloway and another agent informed Ewart of his Miranda[5] rights and asked him if he would agree to be interviewed.  After signing a waiver-of-rights form, Ewart stated that on the night he was arrested, he was planning to steal at least 15 kilograms of cocaine and was in possession of a gun that Strachan had given to him when he was recruited to participate.  He also indicated that he was going to receive a portion of the stolen cocaine as payment for his participation.

Ewart's theories of defense were that he played a minor role in the conspiracy and that Special Officer Tianga failed to follow police procedures during the sting operation because he did not meet with Ewart three times before arresting him.  In support of these theories, Ewart called Special Agent Coy, who testified that during the meeting at the warehouse, Ewart expressed concern that the guards inside the house they were going to rob would know that Tianga was involved in the robbery.  Ewart did not testify.

Forrester testified in his own defense, indicating that he went to Ewart's house on May 27th because Ewart was going to drop him off at a basketball court.  According to Forrester, when he arrived at Ewart's house, Strachan, whom Forrester had never seen before, was there, and Ewart said that he had to take Strachan to meet a friend.  Forrester stated that he was dressed in jeans and a plaid shirt, but had basketball shorts and a tank top on under those clothes.  Ewart drove Forrester and Strachan to Lester's Diner and Strachan and Ewart got out and talked with another man.  After that, the three men drove to the warehouse and went inside.  Forrester said that he did

---

[5] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966).

not know anything about a robbery, but did hear Tianga talking about cocaine and guns.  Special Agent Galloway also testified that during Ewart's interview, Ewart stated that Forrester had come along for the ride but did not know particularly what was going to happen.

Ewart, 164 Fed. Appx. at 927-28; DE 165 – criminal.

The undercover recordings illuminate both the nature and extent of Movant's participation in the conspiracy and are particularly relevant to Movant's claim that counsel was ineffective for not requesting an entrapment defense.  During a meeting between Strachan and Deputy Tianga on May 19, 2004, Strachan attempted to assure Tianga that the individual he would bring to assist in the robbery (later identified as Movant) possessed the necessary expertise and motivation: "That know what he doing.  For real.  He ain't had a job a day in his life.  That's all he do.  I'm serious.  He straight.  It's like, you know, we came up together."  Diner Transcript at 5 (DE 13-2).[6]  When Movant finally met Deputy Tianga, on May 27, 2004, Movant commented that he and Tianga had never met before: "Listen to me.  I know it's the first time you've seen us, especially me and this dude."  Warehouse Transcript at 11 (DE 13-2).[7]  From the outset of their meeting, Movant sought to assure Deputy Tianga that he could be trusted not to betray him during the robbery: "Straight up.  You don't have to worry about that.  We ain't that type of guys.  If you look

---

[6] The Diner Transcript, which is docketed in the civil action at 13-2, is of a meeting between Deputy Tianga and Strachan at Lester's Diner on May 19, 2004.  The Government has represented that this transcript is a copy of "GX 1B," see Response at 4 n.4 (DE 13-1), and it has attached the transcript as Exhibit A to its Response (DE 13-1).

[7] The Warehouse Transcript, which is docketed in the civil action at 13-3, is of a meeting involving Deputy Tianga, Movant, Strachan, and Forrester at a Fort Lauderdale warehouse on May 27, 2004.  The Government has represented that this transcript is a copy of "GX 2B," see Response at 5 n.6 (DE 13-1), and it has attached the transcript as Exhibit B to its Response (DE 13-1).

out like this, you're feeding my family right there, know what I mean . . .  Ya don't worry about that part.  I mean I put my life on it."  Warehouse Transcript at 1 (DE 13-3).  When Deputy Tianga asked whether Movant and his co-conspirators had brought guns, Movant responded:  "Hell yeah."  Warehouse Transcript at 3 (DE 13-3).  Movant discussed conducting the robbery in such a fashion that nobody would suspect Deputy Tianga's involvement with the perpetrators:  "It's gonna be like really on your, your behalf.  We got to really make sure it look like you really don't have nothing do to with it.  Know what I mean?"  Warehouse Transcript at 5 (DE 13-3).  After Movant explained that they intended to "duct tape their ass," Warehouse Transcript at 5 (DE 13-3), Deputy Tianga inquired whether they intended to shoot the guards.  Movant initially responded that they would not but then clarified his response: "Not if they cooperate.  We don't do that.  If they cooperate, everything goes fine.  But, if they don't it's gonna be different."  Warehouse Transcript at 5 (DE 13-3).  Movant explained his concern that they take the cocaine home as soon as possible following the robbery: "No, but I'm saying even though this is like, we don't want to be like on the road with all that s---"; "We wanna get the s--- home."  Warehouse Transcript at 10 (DE 13-3).  Finally, at the conclusion of their meeting, and seconds before his arrest, Movant sought to reassure Deputy Tianga that he could be trusted to deliver to Tianga his share of the stolen cocaine: "I ain't even gonna sit here and try to prove a point to you. . . .  That's my word."  Warehouse Transcript at 12 (DE 13-3).

     B.   <u>Sentencing Hearing</u>

     At the sentencing hearing, the District Court made findings with respect to the Guidelines range.  With respect to Count I, the Court found that the offense level was 32, that the criminal history category was 1, and that the imprisonment range was 121 to 151

months; with respect to Count II, the Court found that 84 months would need to be served

consecutively.[8]  Sentencing Transcript at 3 (DE 162 – criminal).  The Government then

sought an upward departure, which the Court denied.  Id. at 16-17 (DE 162 – criminal).  In

his argument to the Court, Movant's counsel requested a sentence at the low end of the

Guidelines;  counsel, however, did not argue against or otherwise place at issue the

mandatory application of the Guidelines.  Id. at 12-16 (DE 162 – criminal).  The Court

implicitly denied the request of Movant's counsel, stating that it would "impose a sentence

at the high-end of the guideline range, as the Court has determined that the sentence is

necessary to provide adequate punishment and to deter future criminal behavior."  Id. at

17 (DE 162 – criminal).  The Court then imposed a sentence of 235 months – 151 months

as to Count I, followed by 84 months as to Count II.  Id. at 18 (DE 162 – criminal).

IV.    DISCUSSION

        Movant argues that his sentence should be vacated owing to violations of his Sixth

Amendment right to effective assistance of counsel and Fifth Amendment right to due

process of law.  Motion at 11-12 (DE 1 – civil).  More specifically, Movant advances two

substantive arguments:[9]

---

        [8] In pertinent part, 18 U.S.C. § 924(c)(1)(A)(ii) provides that any person who, during
and in relation to any violent or drug trafficking crime, uses or carries a firearm, shall, in
addition to the punishment provided for such violent or drug trafficking crime, be sentenced
to a term of imprisonment of not less than 7 years (84 months) "if the firearm is
brandished."  Because Movant brandished the "baby [G]lock" at the warehouse, the Court
imposed a sentence of 84 months, consecutive to the 151-month sentence imposed for
the narcotics robbery conspiracy.

        [9] In addition, Movant argues that he is entitled to an evidentiary hearing.  Motion at
11 (DE 1 – civil).  For the reasons set forth below, see infra n. 19, the undersigned
concludes that Movant is not entitled to an evidentiary hearing.

> I.    The [Movant] was [d]enied the [r]ight to [e]ffective [a]ssistance of [c]ounsel as [g]uaranteed by the Sixth Amendment to the United States Constitution when [a]ppellate [c]ounsel [f]ailed to [a]rgue that the [Movant] [r]eceived an [u]nreasonable [s]entence which was [g]reater than [n]ecessary to [a]chieve the [g]oals of [s]entencing [u]nder <u>United States v. Booker</u>, when he was [s]entenced [a]ccording to the [m]andatory [a]pplication of the United States Sentencing Guidelines.

> II.   The [Movant] was [d]enied the right to [e]ffective [a]ssistance of [c]ounsel, as [g]uaranteed by the Sixth Amendment to the United States Constitution when [t]rial [c]ounsel [f]ailed to [r]equest] a [j]ury [i]nstruction on [e]ntrapment.

<u>Id.</u> at 11 (DE 1 – civil).   The undersigned, however, does not find either of the two arguments persuasive.

    A.   <u>The Legal Standards for Ineffective Assistance Claims</u>

In <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), the Supreme Court held that "the proper standard for attorney performance is that of reasonably effective assistance" and that the burden is on a movant seeking habeas relief to demonstrate that "counsel's representation fell below an objective standard of reasonableness." <u>Id.</u> at 687-88.   The <u>Strickland</u> Court set forth a two-pronged test to be applied in evaluating claims of ineffective assistance.

The first prong of the <u>Strickland</u> test requires a movant to show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."   <u>Id.</u> at 687.   The test for determining whether an attorney's performance was deficient is not what "the best lawyers" or even what "most good lawyers" would have done, but "only whether some reasonable lawyer . . . could have acted, in the circumstances, as defense counsel acted . . . ." <u>White v. Singletary</u>, 972 F.2d

1218, 1220 (11th Cir. 1992).  "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so."  <u>Rogers v. Zant</u>, 13 F.3d 384, 386 (11th Cir. 1994).  In assessing counsel's performance, a court must avoid second-guessing with the benefit of hindsight and must presume that the performance of counsel was reasonable and adequate.  <u>See</u> <u>Strickland</u>, 466 U.S. at 689; <u>see also</u> <u>Dingle v. Sec'y for Dep't of Corr.</u>, No. 05-13408, 2007 WL 686600, at *6 (11th Cir. 2007); <u>Rogers</u>, 13 F.3d at 387.

The second prong of the <u>Strickland</u> test requires a movant to show that counsel's deficient performance resulted in actual prejudice.  466 U.S. at 693; <u>Wiley v. Wainwright</u>, 709 F.2d 1412, 1413 (11th Cir. 1983) (requiring showing of "actual and substantial prejudice").  To demonstrate prejudice, a movant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  <u>Strickland</u>, 466 U.S. at 694.

A court, however, need not "address both components of the inquiry if the defendant makes an insufficient showing on one."  <u>Strickland</u>, 446 U.S. at 697.  As the Supreme Court has stated, a court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which . . . will often be so, that course should be followed." <u>Id.</u>

Where an ineffective assistance claim is directed to appellate counsel, the same standards govern.  To establish that appellate counsel was ineffective, Movant must show

that he performed deficiently and that such performance resulted in prejudice.  Duest v. Singletary, 967 F.2d 472, 476, 477 n.4 (11th Cir. 1992).  Prejudice will only be found when a review of the merits of an omitted claim on appeal establishes that such a claim would have had a reasonable probability of succeeding.  United States v. Nyhuis, 211 F.3d 1340, 1344 (11th Cir. 2000).  "Appellate counsel is not ineffective for failing to raise claims 'reasonably considered to be without merit.'"  Id. (citing Alvord v. Wainwright, 725 F.2d 1282, 1291 (11th Cir. 1984)).

   B.   Trial Counsel was not Ineffective in Failing to Request an Entrapment
        Instruction

   Movant argues that he was denied his Sixth Amendment right to effective assistance of counsel when his trial counsel failed to request a jury instruction on entrapment.  The undersigned does not agree.  Based on the evidence presented at trial, counsel did not act unreasonably in failing to request the instruction.  And even if counsel had made the request, there does not exist a reasonable probability that the Court would have granted such an instruction.

   The Supreme Court has made clear that "a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor."  Mathews v. United States, 485 U.S. 58, 63 (1988).  Entrapment is a recognized affirmative defense, and therefore an entrapment instruction must be given where the record contains sufficient evidence from which a jury could find in the defendant's favor.  United States v. Quinn, 123 F.3d 1415, 1423 (11th Cir. 1997) ("Entrapment is an affirmative defense, evidence of which must be presented before the issue is considered to be properly raised.").  The entrapment defense is composed of two

-11-

elements – government inducement of the crime and the defendant's lack of predisposition

to commit the crime prior to the inducement.   United States v. Orisnord, 483 F.3d 1169,

1178 (11th Cir. 2007); United States v. Francis, 131 F.3d 1452, 1455-56 (11th Cir. 1997).

The initial burden of showing Government inducement is on the defendant, and, if he is

able to do so, the burden shifts to the Government to prove beyond a reasonable doubt

that the defendant was predisposed to commit the crime. Id. at 1456.  The Eleventh Circuit

has elaborated on the respective burdens:

> [T]he defendant bears the initial burden of production as to
> government inducement[,] and he may meet this burden by
> producing any evidence sufficient to raise a jury issue that the
> government's conduct created a substantial risk that the
> offense would be committed <u>by a person other than one ready
> to commit it</u>.  The defendant may make such a showing by
> demonstrating that he had not favorably received the
> government plan, and the government had to push it on him or
> that several attempts at setting up an illicit deal had failed and
> on at least one occasion he had directly refused to participate.
> Once the defendant produces sufficient evidence of
> inducement, the government must prove beyond a reasonable
> doubt that the defendant was predisposed to commit the
> offense.

Orisnord, 83 F.3d at1178 (citations and internal quotations omitted) (emphasis added).

Indeed, the defendant must "demonstrate not merely inducement or suggestion on the part

of the government but an element of persuasion or mild coercion."  Quinn, 123 F.3d at

1423 (citations and internal quotations omitted).

In Quinn, a narcotics prosecution, the Eleventh Circuit noted that the defendant

"indicated no reluctance to get involved in the drug deal.  Nor [was] there any evidence that

[the law enforcement agent] persuaded or coerced him in any way."  Id.  The court

concluded that "[b]ecause [the defendant] failed to come forward with evidence sufficient

to raise a jury issue of entrapment, . . . the district court correctly refused to instruct on entrapment." Id.  And in Orisnard, which (like the instant case) arose out of a home invasion robbery sting, the Eleventh Circuit observed that neither the agent nor the informant had done anything to "induce" the defendant to participate in the robbery plan. 483 F.3d at 1178.  The Orisnard Court wrote that "[n]othing in the record demonstrated that either the CI or [the agent] had to 'push' the robbery scheme on them, that multiple attempts at setting up the robbery had failed, or that any of the defendants had clearly evinced a refusal to participate." Id.  The court concluded that "[b]]ecause [the defendants] did not meet their burden of demonstrating government inducement, the government was not required to prove beyond a reasonable doubt that [the defendants] were predisposed to commit the charged offenses." Id.

The facts in the instant case are even less supportive of Movant's entrapment argument than were the facts in Orisnard.  Movant here was not recruited by the deputy or by the informant to participate in the home invasion robbery; he was recruited by his brother and co-conspirator, Strachan. See United States v. Ambrose, 707 F.2d 1209, 1213 (11th Cir. 1983) (quoting United States v. Mers, 701 F.2d 1321, 1340 (11th Cir. 1983) ("A defendant cannot avail himself of an entrapment defense unless the initiator of his criminal activity is acting as an agent of the government.")).  Indeed, as Movant himself acknowledged, he had not even met Deputy Tianga until the evening of the planned robbery.  After an initial meeting at a diner, they all proceeded to a warehouse, where Movant brandished the loaded "baby [G]lock" and explained to the agent how he and his co-conspirators were "going to duct tape [the guards'] butts."  Because Movant did not even meet with the deputy until the evening of the planned robbery, and because Movant

brought with him a loaded firearm and duct tape to use during the robbery, he cannot credibly claim that the deputy had "pushed" the robbery scheme on him, that the deputy had tried but failed to set up the robbery, or that he (Movant) evinced any refusal to participate.  See Orisnard, 483 F.3d at 1178 (citing factors militating against a finding of government inducement).  And if Movant's actions alone left any doubt concerning his readiness – indeed, his enthusiasm – to commit the robbery, his post-arrest statement laid that to rest.  Movant confessed that he fully intended to steal 15 kilograms of cocaine and that he brought along a firearm that Strachan had given to him when Strachan recruited him to participate.  Indeed, Movant stated that he was planning to receive a portion of the stolen cocaine as payment.

Movant asserts that the "[G]overnment's agent came up with the idea to commit a robbery and presented that to the [Movant] and the others." Movant's Memorandum at 19 (DE 2).  Although Deputy Tianga did initially conceive of the idea of a robbery and did propose it to Moore and (later) to Strachan, that fact is of no consequence here.  Evidence that a law enforcement officer sought out or initiated contact with a defendant and proposed an illicit transaction is not sufficient to entitle the defendant to an entrapment instruction.  United States. v. Ventura, 936 F.2d 1228, 1233 (11th Cir. 1991); United States v. Andrews, 765 F.2d 1491, 1499 (11th Cir. 1985).  Moreover, here neither Deputy Tianga nor the informant sought out or initiated contact with Movant; rather, Movant was recruited and armed by his brother and co-conspirartor, Strachan.  Indeed, by his own admission, Movant had armed himself (with Strachan's weapon) and had decided to steal 15

kilograms of cocaine, keeping a portion for himself as payment, before he even met or spoke to Deputy Tianga.[10]

Movant also submits that he had problems with the plan as presented by the deputy. Movant's "objection," however, was not to the commission of the home invasion robbery, but merely to the manner of its execution; he was concerned that the guards might suspect Deputy Tianga's involvement.   In addition, Movant submits that he expressed his unwillingness  to shoot anyone.  Although a lack of willingness to actually fire a weapon does not negate an intent to rob – and, therefore, is irrelevant – the record does not even fully support Movant's claim.  The transcript shows that Movant actually conditioned his reluctance to shoot on the guards' cooperation.  See Warehouse Transcript at 5 (DE 13-3) ("If they cooperate, everything goes fine.  But, if they don't it's gonna be different.").  Movant's preferred tool for neutralizing the guards was duct tape.   See Warehouse Transcript at 5 (DE 13-3).

Indeed, far from expressing any unwillingness to commit the robbery, Movant joined in its planning.  He asked how many people would be in the house, whether they would be armed, whether the deputy had been in the house previously, whether the deputy wanted to be in the house when they came in, whether the door would be locked; Movant also discussed committing the robbery in a fashion that would allay any suspicion of the deputy's involvement. Warehouse Transcript at 4-10 (DE 13-3).  Movant further discussed

_____

[10] The undersigned notes that Movant had previously been arrested, though not convicted, for armed home invasion robbery.  See Sentencing Transcript at 11 (DE 162 – criminal case).

the post-robbery logistics, stressing the importance of taking the stolen cocaine to a safe location as soon as possible after the robbery.  Warehouse Transcript at 10 (DE 13-3).[11] Hence, Movant's contention that "[a]t no time did [he] engage in any act that showed an independent willingness to engage in criminal behavior free from the inducement of [G]overnment officials," Movant's Memorandum at 20 (DE 2), is not supported by – indeed, it is amply rebutted by – the record.

Against this factual backdrop, trial counsel could not have successfully argued to the Court that Movant had met his threshold burden of producing "evidence sufficient to raise a jury issue that the government's conduct created a substantial risk that the offense would be committed by a person other than one ready to commit it."  Orisnord, 483 F.3d at 1178.  Because Movant could not have satisfied his burden of showing inducement, the

─────────────────

[11] In rejecting Movant's insufficiency of the evidence argument, the Eleventh Circuit recited the "ample evidence" of Movant's participation in the conspiracy:

> (1) Ewart's participation in the conversation at the warehouse regarding the details and planning of the robbery, during which he displayed a gun, and stated that the guards and Tianga would have to be tied up with duct tape; (2) the discovery of duct tape in the car Ewart drove to the meeting; (3) Ewart's statements, during his confession to ATF agents, that he was recruited by Strachan to commit the robbery, was prepared to commit a robbery on the night of the arrest, was going to steal at least 15 kilograms of cocaine, and was supposed to get some of the cocaine for his participation; and (4) Strachan told Deputy Tianga that he could recruit others, including someone "like [his] brother," to commit the robbery and subsequently introduced Ewart to Tianga as "my brother."

Ewart, 164 Fed. Appx. at 929-930; DE 165 – criminal.

Government would never have been required to show predisposition,[12] and the Court would have had no evidentiary basis to justify giving an entrapment instruction.

Finally, because there was not a foundation in the record for an entrapment instruction, Movant cannot now successfully argue that "no reasonable lawyer, in the circumstances," would have acted as did his trial counsel.  Rogers, 13 F.3d at 386.  For that same reason, neither can Movant successfully argue that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." [13]  Strickland, 466 U.S. at 694.  In sum, no credible argument can be made that trial counsel's failure to request an entrapment instruction "fell below an objective standard of reasonableness." Id. at 687-88.

### C.     Appellate Counsel was Not Ineffective in Failing to Claim a Sentencing Error

Movant argues that counsel was ineffective in failing to claim a sentencing error on direct appeal.  Memorandum at 4 (DE 2). According to Movant, his "appellate counsel failed to raise the issue that [he] was sentenced according to the mandatory application of the Sentencing Guidelines, a practice subsequently prohibited by the Supreme Court in

---

[12] Even if Movant had been able to show some Government inducement, the evidence of his predisposition was overwhelming.  Movant was recruited by Strachan to participate in the robbery of 15 kilograms of cocaine, and he arrived with Strachan on the date of the planned robbery carrying a loaded Glock semi-automatic pistol and a roll of duct tape (in the car) that he planned to use during the robbery.  Hence, there can be no reasonable doubt that Movant was predisposed to commit the robbery even before he met the deputy.

[13] Movant has raised the argument that during deliberations, the jury sent the Court a note, asking: "Can or does entrapment play a part in these charges, according to Count I" (DE 160 – criminal; p. 526).  The Court instructed the jury that the answer to their question was "no" (DE 160 – criminal; p. 527).  The Court's response to the jury question lends support to the undersigned's finding that there is not a reasonable probability that an entrapment instruction would have been given had it been requested by trial counsel.

United States v. Booker, 125 S.Ct. 738 (2005)."  Id. (DE 2).  Movant explains that he was

sentenced on December 10, 2004, and at that time the federal courts were operating under

a mandatory Guidelines regime.   Approximately one month after the sentencing, on

January 12, 2005, the Supreme Court rendered its decision in Booker, holding the

mandatory application of the Sentencing Guidelines unconstitutional; the Supreme Court

made the Guidelines advisory and applied its ruling to all cases then on direct review.

Movant, therefore, reasons that when counsel filed his brief on the direct appeal in August

2005, he should have argued the sentencing implications of the Booker decision.  Id. (DE

2).  Furthermore, had counsel advanced the  Booker argument on the direct appeal,

Movant reasons, "there exists a reasonable probability that . . . the results would have been

different" – the case would have been remanded to the District Court for resentencing.

See id. at 5 (DE 2 ).  The undersigned is not persuaded.

Movant's explanation of the Booker decision is correct; however, his application of

its holding to this case is not.  The Supreme Court in Booker did conclude that the

mandatory nature of the Sentencing Guidelines rendered them incompatible with the Sixth

Amendment right to a jury trial.  125 S.Ct. at 749-51.  To preserve Congress's intent in

enacting the Sentencing Reform Act of 1984, the Court excised two parts of the Act that

rendered the mandatory Guidelines unconstitutional: the portion of 18 U.S.C. § 3553(b)(1)

making Guidelines binding on sentencing courts; and the portion of 18 U.S.C. § 3742(e)

setting forth the standard of review on appeal, including *de novo* review of departures from

the applicable Guidelines range.  Id. at 764.  As a result, the Guidelines range "is now

advisory; it no longer dictates the final sentencing result but instead is an important

sentencing factor that the sentencing court is to consider, along with the factors contained

in 18 U.S.C. § 3553(a)." <u>United States v. Cook</u>, 140 Fed. Appx. 203, 209 (11th Cir. 2005) (unpublished).[14]  In addition, as Movant correctly notes, the <u>Booker</u> Court instructed that its holding applied to cases on direct review.  <u>Id.</u> at 769.  Hence, a failure to advance a <u>Booker</u> claim on direct appeal would render the claim abandoned.  <u>United States v. Shelton</u>, 400 F.3d 1325, 1330 n.5 (11th Cir. 2005) (citing <u>United States v. Ardley</u>, 242 F.3d 989, 990 (11th Cir. 2001)).  Here, counsel could have, yet failed to, raise a <u>Booker</u> claim on direct appeal; the claim, therefore, was abandoned.  However, to determine whether Movant suffered actual prejudice (and, hence, ineffective assistance) as a result of counsel abandoning the <u>Booker</u> claim, this Court must first assess whether that claim would have succeeded on appeal had it been raised.  <u>See</u> <u>Nyhuis</u>, 211 F.3d at 1344 (prejudice found when omitted claim would have had a reasonable probability of succeeding on appeal).

Had counsel advanced a <u>Booker</u> claim on direct appeal, the standard of review that the Eleventh Circuit would have applied is not only significant, but in this case largely determinative of the outcome.  Because the sentencing error was not preserved before the District Court, any <u>Booker</u> claim advanced on direct appeal would have been subject to "plain error" review.  <u>See</u> <u>United States v. Ronda</u>, 455 F.3d 1273, 1303 (11th Cir. 2006) (<u>Booker</u> error raised for first time on appeal reviewed for "plain error"); <u>Shelton</u>, 400 F.3d at 1328 (same); <u>United States v. Cantu</u>, 174 Fed. Appx. 470, 471 (11th Cir. 2006)

---

[14]  Although Eleventh Circuit Rule 36-2 dictates that "[u]npublished opinions are not considered binding precedent," that same Rule allows that unpublished opinions may "be cited as persuasive authority."

("Because Cantu did not raise a <u>Booker</u> claim at his sentencing hearings, we review his claim for plain error only.").[15]  The <u>Shelton</u> explained the "plain error" standard of review:

> An appellate court may not correct an error the defendant failed to raise in the district court unless there is: (1) error, (2) that is plain, and (3) that affects substantial rights.  If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.

<u>Id.</u> at 1328-29 (citations and internal quotations omitted); <u>accord</u> <u>Ronda</u>, 455 F.3d at 1304 (setting forth elements of plain error analysis); <u>United States v. Williams</u>, 139 Fed. Appx. 215, 218 (11th Cir. 2005) (same).

Had Movant's counsel raised a <u>Booker</u> argument on direct appeal, the Eleventh Circuit, as it did in <u>Shelton</u>, would have recognized that the District Court followed the correct sentencing procedure at the time it sentenced Movant.  See <u>Shelton</u>, 400 F.3d at 1330.  But because the District Court "consider[ed] [the Guidelines] as binding as opposed to advisory," the Eleventh Circuit, as it did in <u>Shelton</u>, would have had to "conclude that it was <u>Booker</u> error for the district court to [have] sentence[d] [Movant] under a mandatory

---

[15] Had the sentencing error been raised in the District Court, the Eleventh Circuit would have reviewed for "harmless error."  See <u>United States v. Glover</u>, 431 F.3d 744, 749 (11th Cir. 2005); <u>United States v. Mathenia</u>, 409 F.3d 1289, 1291 (11th Cir. 2005); <u>United States v. Paz</u>, 405 F.3d 946, 948 (11th Cir. 2005).  Under this "harmless error" standard of review, the burden of proof is on the Government, rather than on the defendant, and the burden is a difficult one to meet.  See <u>Mathenia</u>, 409 F.3d at 1292 (stating that "[i]t is as difficult for the [G]overnment to meet that [non-constitutional harmless error] standard as it is for a defendant to meet the third-prong prejudice standard for plain error review").  More specifically, because the <u>Booker</u> error alleged here – mandatory application of the Guidelines – is of the statutory or non-constitutional variety, under harmless error review the Government would have had to show the appellate court that the mandatory application of the Guidelines had no effect or only a very slight effect on Movant's sentence.  See <u>Mathenia</u>, 409 F.3d at 1292.

Guidelines scheme . . . ."  Id. at 1330-31; Glover, 431 F.3d at 749 ("Because the district court considered the Guidelines to be mandatory, it committed statutory Booker error."). In addition, because the error was "contrary to the law at the time of appeal," the Eleventh Circuit would have had to find that the error was "plain."  Williams, 139 Fed. Appx. at 218; accord Shelton, 400 F.3d at 1331 (same); see also United States v. Underwood, 446 F.3d 1340, 1343 (11th Cir. 2006) (even though error not plain at time of sentencing, subsequent issuance of Booker established that error was plain at time of appellate consideration). Thus, under the "plain error" standard, the Eleventh Circuit would have found the first two prongs satisfied, notwithstanding that the District Court followed the prevailing law at the time of sentencing.

In determining whether the plain error affected Movant's substantial rights – the third prong of plain-error review – the Eleventh Circuit would have looked to see if Movant carried his burden of persuasion as to prejudice.  Shelton, 400 F.3d at 1331.  Movant's "burden of showing prejudice to meet the third-prong requirement is anything but easy." Id. at 1332.  To satisfy the third prong of the "plain error" standard, Movant would have had to show the Eleventh Circuit that the error "actually did make a difference."  Id. (citations and internal quotations omitted).  More specifically, the Eleventh Circuit would have "ask[ed] whether there is a reasonable probability of a different result if the guidelines had been applied in an advisory instead of binding fashion by the sentencing judge in this case."  Id. (citations and internal quotations omitted).  According to the Eleventh Circuit: "A reasonable probability of a different result means a probability sufficient to undermine

confidence in the outcome." Id. (citations and internal quotations omitted).[16] Satisfying this standard "takes something more than showing the district court sentenced within the Guidelines range and felt bound to do so, especially given that the Guidelines range remains an important factor in sentencing." Id.

Had Movant's counsel raised the Booker argument on direct appeal, he would not have been able to satisfy the third-prong of the "plain error" standard.  Here, the Court never expressed any frustration with the severity of the mandatory Guidelines nor a desire to impose a lesser sentence.  Indeed, the District Court implicitly rejected the overtures of Movant's trial counsel to impose a sentence at the low end of the applicable Guideline range.  Citing the need "to provide adequate punishment and to deter future criminal behavior," the Court instead imposed a sentence at the high(est) end of the Guideline range.  Sentencing Transcript at 17 (DE 162 – criminal);  see 18 U.S.C. § 3553(a)(2)(A),(B)

---

[16] The Eleventh Circuit has categorized Booker errors as either constitutional or statutory:

> Based on the Supreme Court's holding, we have explained that there are two types of Booker error: (1) a Sixth Amendment error – the error of imposing a sentencing enhancement based on judicial findings that go beyond the facts admitted by the defendant or found by the jury, and (2) a statutory error – the error of being sentenced under a mandatory guidelines system.

Williams, 139 Fed. Appx. at 218 (citing Shelton, 400 F.3d at 1330-31).  Where there exists constitutional Booker error, the defendant must demonstrate that the error affected the outcome of the district court proceedings.  Williams, 139 Fed. Appx. at 218.  But where there exists statutory Booker error, the defendant must demonstrate that there was a reasonable probability of a different outcome had the guidelines been applied in an advisory, rather than binding, fashion by the sentencing judge.  Id. at 218-19 (quoting Shelton, 400 F.3d at 1332).  Hence, it is because the Booker error claimed here is statutory (rather than constitutional) that Movant must establish a reasonable probability of a different outcome under advisory guidelines.

(citing need for sentence to provide just punishment and to deter criminal conduct).  Such a high-end sentence does not permit an inference that the Court would have imposed a more lenient sentence under an advisory Guidelines system.  See Ronda, 455 F.3d at 1305.  Further, contrary to Movant's suggestion that the Court did not take into account the sentencing factors at 18 U.S.C. §3553(a), the record shows that the Court did consider those factors and explicitly relied on two of those factors – punishment and deterrence – in imposing sentence within the Guidelines range.  Given the Court's decision to sentence Movant to the maximum term permitted by law, as well as its statement that such a sentence was necessary to ensure adequate punishment and deterrence, the undersigned concludes that appellate counsel could not have successfully argued a reasonable probability of a lower sentence under an advisory Guidelines regime.[17]

The undersigned finds direct support for this conclusion in several Eleventh Circuit decisions.  In United States v. Cantu, 174 Fed. App. 470, 472 (11th Cir. 2006), the district court committed only statutory Booker error.  Moreover, like this Court, the court in Cantu sentenced the defendant "to the highest point on his applicable Guideline range . . . ."  Id.  And, like the record before this Court, "there [was] no indication from the record of [Cantu's] first sentencing hearing that the district court would have considered a sentence below his applicable Guideline range."  Id.  The Eleventh Circuit in Cantu concluded that

_____

[17] The undersigned notes that even though the Guidelines are advisory only, they nonetheless "remain an essential consideration in the imposition of federal sentences, albeit along with the factors in § 3553(a)."  Shelton, 400 F.3d at 1332 n.9.  Significantly, the factors that sentencing courts are required to consider under Booker and § 3553(a) are "a virtual mirror image" of the factors the Sentencing Commission was required to use in developing the Guidelines.  Id.  These similarities render it even less likely that the non-mandatory application of the Guidelines, along with the factors in § 3553(a), would have resulted in a lower sentence.

because "the record does not show a reasonable probability that the district court would have imposed a lesser sentence on Cantu had the Guidelines been advisory, Cantu's substantial rights were not affected by the court's treatment of the Guidelines as mandatory, and the district court did not commit plain error." Id. Similarly, in United States v. Blasingame, 219 Fed. Appx. 934, 951 (11th Cir. 2007), the Eleventh Circuit held that defendants who were sentenced at the highest end or near the top of the Guidelines range could not establish a reasonable probability of a lower sentence had the Guidelines been advisory.[18]  And in United States v. Rhonda, 455 F.3d at 1305, the Eleventh Circuit stated that "[a] sentence in the middle or high end of the range . . . suggests that the district court did not prefer a more lenient sentence and would not have imposed one under an advisory system."

Taken together, Cantu, Blasingame, and Rhonda offer strong support for the conclusion that Movant would not have been able to establish a reasonable probability of a lesser sentence under an advisory Guidelines system.  Because Movant would not have been able to establish such a probability – and, therefore, would not have been able to establish that his "substantial rights" were affected – he would not have been able to satisfy the "plain error" standard on direct review.  And because prejudice will only be found when an omitted claim on appeal would have had a reasonable probability of succeeding, see Nyhuis, 211 F.3d at 1344, Movant cannot here prevail on his constitutional claim of ineffective assistance of appellate counsel.

---

[18] As unpublished decisions, Cantu and Blasingame are not binding authority; they are, however, persuasive.  See Eleventh Circuit Rule 36-2.

V.    <u>CONCLUSION</u>

Against the backdrop of this factual record, trial counsel was not ineffective in failing to request an entrapment instruction.  And given that appellate counsel could not have established a reasonable probability of a lower sentence under an advisory Guidelines regime, appellate counsel was not ineffective in failing to raise a <u>Booker</u> argument on direct appeal.  In sum, it was not ineffective assistance by Movant's trial and/or appellate counsel, but powerful evidence of Movant's participation in the narcotics robbery conspiracy, coupled with his brandishing of a firearm to be in the robbery, that resulted in his conviction and lengthy sentence.  Accordingly, the undersigned respectfully RECOMMENDS that the Motion to Vacate, Correct, or Set Aside the Petitioner's Sentence Pursuant to 28 U.S.C. § 2255 (DE 171 – criminal; DE 1 – civil) filed by Marvin Ewart ("Movant") be DENIED.[19]

---

[19]    Movant has requested an evidentiary hearing.  "A [movant] is entitled to an evidentiary hearing if he alleges <u>facts</u> which, if true, would warrant habeas relief."  <u>Tejada v. Dugger</u>, 941 F.2d 1551, 1559 (11th Cir. 1991) (emphasis added).  But, as the Eleventh Circuit has made clear: "[T]he district court need not hold an evidentiary hearing every time a section 2255 claim of ineffective assistance is raised.  A hearing is not required on patently frivolous claims or those which are based upon unsupported generalizations.  Nor is a hearing required where the [movant's] allegations are affirmatively contradicted in the record."  <u>United States v. Laetividal-Gonzalez</u>, 939 F.2d 1455, 1465 (11th Cir. 1991), <u>abrogated on other grounds by Gozlon-Peretz v. United States</u>, 498 U.S. 395 (1991).  Nor is "[a] petitioner . . . entitled to an evidentiary hearing . . . when his claims are merely conclusory allegations unsupported by specifics or contentions that in the face of the record are wholly incredible."  <u>Tejada</u>, 941 F.2d at 1559 (internal quotation marks and citations omitted); <u>see also</u> <u>Peoples v. Campbell</u>, 377 F.3d 1208, 1236-37 (11th Cir. 2004) (evidentiary hearing not necessary where petition contains conclusory allegations); <u>Lynn v. United States</u>, 365 F.3d 1225, 1239 (11th Cir. 2004) (same).

Based on the clear record before this Court – showing Movant's enthusiastic participation in the robbery conspiracy and the District Court's demonstrated desire to sentence Movant to the maximum permitted by law – Movant cannot show that trial counsel was ineffective in failing to request an entrapment instruction and/or that appellate counsel was ineffective in failing to raise a <u>Booker</u> claim.  Accordingly, the undersigned finds that Movant is not entitled to an evidentiary hearing on his ineffective assistance claims.

The parties will have ten (10) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable James I. Cohn, United States District Judge.  Failure to file objections timely shall bar the parties from a *de novo* determination by the district judge of an issue covered in the report and shall bar the parties from attacking on appeal factual findings accepted or adopted by the district judge except upon grounds of plain error or manifest injustice. See 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140, 149 (1985); Henley v. Johnson, 885 F.2d 790, 794 (11th Cir. 1989).

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 19th day of October 2007.

BARRY S. SELTZER
United States Magistrate Judge

Copies to:

Honorable James I. Cohn
United States District Judge

Donald F. Chase, Esq.
Assistant United States Attorney
500 East Broward Boulevard, 7th Floor
Fort Lauderdale, Florida   33301

Jacqueline Elizabeth Cannavan, Esq.
3864 Sheridan Street
Hollywood, Florida   33021-1406
Attorney for Movant Marvin Ewart

Robert A. Ratliff, Esq.
713 Dauphin Street
Mobile, Alabama   36602
Attorney for Movant Marvin Ewart